## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.: 06-228 (ESH)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANNA BOLING** | : | |
| **RODERIC L. BOLING, and** | : | |
| **JEFFREY S. MILLS** | : | |
| **Defendants.** | : | |

## GOVERNMENT'S OMNIBUS OPPOSITION
## TO DEFENDANTS' MOTIONS TO SEVER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits the following omnibus opposition to defendants' pretrial motions to sever. For the reasons set forth below, the United States respectfully requests that defendants' motions to sever (documents #34, #37, #41 and #56) be denied.

## I.    FACTUAL BACKGROUND[1]

### A.    Overview

Defendants Roderic Boling ( R. Boling), Anna Boling (A. Boling) and Jeffrey Mills (Mills) were integral members of a conspiracy and scheme to artificially inflate and manipulate the stock price of five publicly traded companies, and to fraudulently induce investors throughout the United States to purchase the common stock of these publicly traded companies at artificially inflated and manipulated prices, thereby enriching themselves and others, including co-conspirators. The five publicly traded companies were: Maui General Stores, Inc. ("MAUG"), Innovative Food Holdings, Inc. ("IVFH"); Power3 Medical Products, Inc.

---

[1]  This is a summary of some of what the Government expects the evidence to show at trial. The summary discusses only portions of the government's evidence. It is not intended to describe all the evidence which the government may present at trial.

("PWRM"), Donini, Inc. ("DNNI"), and 5G Wireless Communications, Inc. ("FGWC"). An

additional purpose of the defendants' conspiracy and scheme fraudulently to promote these

stocks was to conceal their criminal scheme and activities from the United States Securities and

Exchange Commission, the securities markets, and the actual and prospective investors in the

stock of MAUG, IVFH, PWRM, FGWC and DNNI. In executing their conspiracy and scheme,

the defendants also caused the distribution of fraudulent hoax voicemail messages touting the

purchase of at least two other publicly traded companies: American Multiplexer Corp.

("AMUT") and Twister Networks, Inc. ("TWTN").

     The United States expects the evidence at trial to show that at various times in July 2004

through August 18, 2004, the defendants caused telemarketing firm Telephone Broadcast

Company and its affiliate Telephony Leasing Corporation, LLC, ("TBC") to broadcast

fraudulent hoax voicemail messages containing the voice of Anna Boling to voicemail systems

and answering machines throughout the United States, including within the District of Columbia.

The defendants intended these messages to deceive prospective investors into believing they had

inadvertently received a confidential stock tip intended for the close friend of the person leaving

the voicemail message on their voicemail/answering machines.

     Each message purported to be a message left by a woman for her close friend in which

she attempted to convey to her close friend a stock tip from a "hot stock exchange guy" that she

was or had been dating and whose previous stock tip had been accurate and possibly very

lucrative for her father. By design, each hoax message was made to appear to have been

mistakenly left on the listener's answering machine or voicemail system rather than on the close

friend's system or machine. In reality, as the defendants well knew, the fraudulent hoax

voicemail messages were broadcast to thousands of answering machines/voicemail systems throughout the United States.  As planned, the distribution of fraudulent hoax voicemails touting the stocks of MAUG, IVFH, PWRM, DNNI and FGWC resulted in material increases in price and volume of each of the stocks, and artificially inflated and manipulated the market for these stocks.

Contrary to the representations in the voicemail, the person leaving the message had not received a stock tip from a hot stock exchange guy she was dating.  In addition, this non-existent stock exchange guy had not previously given her father a hot tip on a stock that thereafter significantly rose in value.  Moreover, the stock tip was not a secret.  In addition, the stock tip did not disclose to recipients of the message that people who had caused the message to be distributed were being compensated or had been promised compensation.  The stock tip also did not disclose that people who had paid for the voicemail stock promotion or had promised payment were selling stock into the promotion.

The defendants and other involved with the stock promotions profited from the conspiracy and scheme to defraud.  Defendant Mills' through his company Direct Results of Sweetwater ("Direct Results"),  received more than 250,000 shares of IVFH stock to do the voicemail promotion of IVFH stock, and sold more than 220,000 shares of this stock during the fraudulent stock promotion.  In addition, defendant Mills through Direct Results also received a portion of the proceeds from the sale of MAUG stock during the fraudulent stock promotion, and had negotiated to have a large number of shares of FGWC and DNNI stock transferred as payment for the promotion of FGWC and DNNI stock.[2]  Defendants Mills and R. Boling also

---

[2]Ultimately, the FGWC and DNNI shares were not delivered.

received a bag of cash containing well in excess of $40,000 at a Mississippi casino. Mills and R. Boling paid a portion of this cash to Michael O'Grady ("O'Grady"). However, R. Boling went home with an unknown amount of this cash at a time when Anna Boling totally relied upon R. Boling for monetary support. Meanwhile, various victims around the country lost money as a result of being fraudulently induced by the defendants' scheme to purchase the securities which the defendants fraudulently promoted.

### B.    Initiation of the Stock Promotion Enterprise and Conspiracy

The United States expects the evidence at trial to prove that in or about July and August 2004 defendant Mills, who was an experienced stock promoter, was hired to promote the publicly traded common stock of MAUG, IVFH, PWRM, FGWC, and DNNI. This common enterprise was to promote these stocks for profit. It is anticipated that this evidence will include testimony by people who either hired or asked Mills to engage in the stock promotions, or who had discussions with Mills about how he intended to promote at least one of the stocks. In return for doing stock promotions for these securities, Mills was promised various cash and stock compensation. The evidence will show that Mills conspired with R. Boling and A. Boling to use the fraudulent hoax voicemails described in the indictment to fraudulently promote the stocks and to induce unsuspecting victims to purchase the promoted securities at inflated prices. The evidence at trial will establish that Mills, R. Boling and A. Boling each knew and understood the fraudulent content of the voicemails that were distributed to artificially inflate the price of the promoted securities and to fraudulently induce unsuspecting investors to purchase the promoted securities at inflated and manipulated prices.

### C.    Engaging TBC to Broadcast Stock Promotion Voicemails

In or about the Summer of 2004, Company A, which was partially owned and controlled by R. Boling, owed TBC a substantial amount of money for prior pre-recorded message telemarketing campaigns which were not related to stock promotions. These pre-recorded message telemarketing campaigns were related to satellite television subscriptions, and some of the messages featured the voice of A. Boling, who was an experienced telemarketer. In return for executing the satellite television campaigns, TBC received payments that were based upon a multiple of the telephone bills for running the telemarketing campaigns and also received regular deliveries of federal express packages which contained several thousand dollars in cash. R. Boling had an established pattern of making cash payments to TBC for telemarketing campaigns.

In or about July 2004, R. Boling contacted O'Grady about a new voicemail message telemarketing campaign for a stock promoter O'Grady later learned was Mills. Through numerous telephone calls, R. Boling gave O'Grady special instructions with regard to this stock promotion campaign. R. Boling instructed O'Grady to keep knowledge of the stock campaign by TBC employees to a minimum; that all orders for the campaign should be done over the telephone; and that no e-mails or written reports should be made. R. Boling further instructed O'Grady on how the campaign was to be run. For example, R. Boling told O'Grady that the pre-recorded messages should only be played if an answering machine or voicemail system answered the call, and that no telephone number should be dialed twice during the campaign. R. Boling promised to pay for the telemarketing campaign with cash, and O'Grady agreed to have TBC do the stock promotion voicemail telemarketing campaign for R. Boling and his stock promoter client (Mills).

### D.    Background information on TBC's operations and records

The United States expects to present evidence at trial concerning the system clients utilized to have TBC distribute prerecorded messages, and the records that were ordinarily generated during TBC telemarketing campaigns. This includes evidence that clients of TBC utilized a toll-free number to leave or "drop" pre-recorded messages onto the "onebox system" for distribution to telephone subscribers throughout the United States. Once a pre-recorded message was "dropped," the onebox system automatically kept a record of the phone number from which any pre-recorded message was loaded onto the system, and sent an automated e-mail to TBC notifying TBC that a new message had been received and identifying the telephone number from which the message had been dropped.

Once the onebox system automated email was received, a TBC technician set up the voicemail campaign pursuant to the customer's parameters. In addition, a TBC technician would obtain the pre-recorded message from the onebox system, eliminate blank space from the message, if necessary, and save the message onto the TBC system. Once the telemarketing campaign was begun, TBC computers in Atlanta and in Dallas automatically dialed selected telephone numbers and played the client's pre-recorded messages as directed.

### E.    The MAUG Fraudulent Hoax Voicemail Campaign

On or about July 24, 2004, A. Boling called the toll-free number for the onebox system and recorded a fraudulent hoax voicemail message which touted the stock of MAUG for distribution throughout the United States by TBC. The onebox system automated e-mail to TBC reflects that A. Boling recorded the MAUG fraudulent hoax voicemail message from one of her home telephone numbers.

6

Beginning on or about July 25, 2004, TBC distributed in substance the following message recorded by A. Boling to answering machines and voicemail systems throughout the United States:

> Hey Tracy, its Debbie, I couldn't find your old number and Tammy said this was your new one, I hope it's the right one. Anyway, remember Evan that hot stock exchange guy I'm dating? He gave my dad that stock tip on WLSF and it went from under a buck to like 3 bucks in two weeks and you were mad I didn't call you. Well, I am calling you now. This new company is supposed to be like the next Tommy Bahama, and they're making some big news announcement this week. The stock symbol is MAUG. He said it's cheap now like 50 cents. . .I'm sorry I am eating cause I'm starving. . .Its 50 cents now and it is going up to like 5 or 6 bucks this week, so get as much as you can. Call me on my cell, I am still in Orlando (407) 399-9810 and dad and I are buying a bunch tomorrow and I already called Kelly and Ron too. Anyways, I miss you give me a call. Bye.

A TBC employee saved the fraudulent hoax voicemail message on her computer under the name, "407.wav."

In addition to recording the fraudulent hoax voicemail message above concerning MAUG on the onebox system, A. Boling recorded an outgoing message for the voicemail system for AT&T prepaid wireless cell phone number (407) 399-9810, which cell phone number was referenced in the MAUG hoax voicemail. A. Boling recorded the outgoing message on the cell phone voicemail in such a way that any person calling the cell phone number in the fraudulent MAUG voicemail would hear her voice indicating that they had reached Debbie and should leave a message.[3] Billing records for AT&T prepaid wireless number (407) 399-9810 reflect that thousands of people called the cell phone number during the relevant period, and heard Anna Boling's voice in the voicemail message for the cell phone announce in substance that they

---

[3]This was obviously done to deceive people into believing that the fraudulent hoax voicemail message was in fact a real message that a woman had intended to leave for a close friend.

had reached Debbie.  Significantly, during the search of Mills' home, law enforcement agents recovered a manual for an AT&T pre-paid wireless phone which had written on the back of the manual the cellular telephone number (407) 399-9810.  The discovery of the manual for the pre-paid AT&T wireless cell phone at Mills' home provides critical evidence of the link between Mills and A. Boling in perpetrating the crimes charged in the Indictment.

Prior to the distribution of the MAUG fraudulent hoax voicemails, Mills informed a partner ("Partner 1") in the MAUG stock promotion campaign of the date the campaign would begin. Partner #1 had promised to pay Mills a portion of the proceeds of MAUG stock that Partner #1 intended to sell during the MAUG promotion.  On July 28, 2004, R. Boling called O'Grady and informed O'Grady that a voicemail message had been dropped on TBC's system for a stock which traded under the symbol MAUG.  R. Boling informed O'Grady that the pre-recorded message was a stock promotion that would be combined with an e-mail and mail campaign.  Among other things, R. Boling advised O'Grady to purchase shares of the common stock of MAUG, and wait for the promotion to kick in.  R. Boling informed O'Grady that he would tell O'Grady when to sell the stock.  As advised by R. Boling, O'Grady did place an order to purchase shares of MAUG stock.

Partner #1 sold tens of thousands of shares of MAUG stock during the fraudulent hoax voicemail promotion of MAUG.  Thereafter, Partner #1 provided Mills' company Direct Results of Sweetwater with more than $25,000 of the proceeds from his sale of MAUG stock.

**F.      The IVFH Fraudulent Hoax Voicemail Campaign**

On or about August 5, 2004, a brokerage account for Mill's company Direct Results of Sweetwater received 250,000 shares of IVFH stock as payment to Mills for doing a stock

promotion campaign for IVFH stock.  R. Boling informed O'Grady that there would be a

voicemail campaign which would promote IVFH stock, and R. Boling advised O'Grady to

purchase shares of IVFH stock.  After receiving this information from R. Boling, O'Grady

purchased shares of IVFH stock on August 5, 2004 and on August 10, 2004.

On August 6, 2004, Anna Boling called the onebox system from one of her home

telephone lines, and dropped a fraudulent hoax voicemail message onto the onebox system for

distribution by TBC.  This fraudulent hoax voicemail message touted the stock of IVFH.

Beginning on or about August 6, 2004, TBC distributed in substance the following message

recorded by A. Boling to answering machines and voicemail systems throughout the United

States:

> Hey Pam, it's Renee.  Um, I lost your old number and Tammy said this was your
> new one– I hope it's the right one.  Anyway, remember Seth, that hot stock
> exchange guy I'm dating?  And remember when he gave my dad that stock tip in
> June on SMSI and it went from a buck to like five bucks in two weeks and you
> were mad because I didn't call you about it?  Well, I'm calling you now.  There's
> this new company that just signed a big food deal with Emeril, you know the TV
> chef, and they're making a big announcement this week.  Anyway, the stock
> symbol is IVFH.  He said its cheap now, like $.25, but after this weekend it's
> going to be taking off, so get as much as you can.  Call me on my cell phone ok?
> I'm still in Orlando, its 407-491-8093.  And, uh, my dad and I are gonna be
> buying a bunch and I called Kelly and Ron, too.  Anyways, give me a call.  I miss
> you. Bye.

A TBC employee saved the message on her computer and named the message

"rb_0806_live_01_old.wav."

In addition to recording the fraudulent hoax voicemail message above concerning IVFH

on the onebox system, A. Boling recorded an outgoing  message for the voicemail system for

AT&T prepaid wireless cell phone number (407) 491-8093, which cell phone number was

referenced in the IVFH hoax voicemail.  A. Boling recorded the outgoing message on the cell

phone voicemail in such a way that any person calling the cell phone number in the fraudulent IVFH voicemail would hear her voice indicating that they had reached Renee and should leave a message. Billing records for AT&T prepaid wireless number (407) 491-8093 reflect that thousands of people called the cell phone number during the relevant period, and heard Anna Boling's voice in the voicemail message for the cell phone announce in substance that they had reached Renee.

On August 12, 2004, Mills' Direct Results brokerage account began selling IVFH shares. By August 16, 2004, Mills' Direct Results account had sold 220,000 shares of IVFH, which he had received for free. Mills' Direct Results account sold the remaining shares of IVFH on August 23, 2004. In total, Mills' Direct Results account profited more than $90,000 from the sale of IVFH shares.

### G.    The PWRM Fraudulent Hoax Voicemail Campaign

Prior to the beginning of the PWRM fraudulent hoax voicemail campaign, R. Boling contacted O'Grady and informed him that a voicemail campaign for PWRM would be done, and advised O'Grady to purchase shares of PWRM stock. On or about August 10, 2004, O'Grady purchased 5,000 shares of PWRM stock.

On or about August 11, 2004, Anna Boling called the onebox system from one of her home telephone lines, and dropped a fraudulent hoax voicemail message touting the stock of PWRM. Beginning on or about August 11, 2004, TBC distributed in substance the following message recorded by A. Boling to answering machines and voicemail systems throughout the United States:

10

Hey Steph, its Wendy.  I looked for you old number and I couldn't find it but Brady says this is your new one.  I hope it's the right one.  Anyway, remember Evan, that hot stock exchange guy I'm dating–he gave my dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you?  Well, I'm calling you now.  There's this new company that supposedly developed some zillion dollar cancer test thing and it's going to go up big this week–some patent thing, whatever that is.  Anyway, the stock symbol is P-W-R-M, and he says it gonna open cheap, like $2.50–I'm sorry, I'm eating 'cause I'm starving–it's $2.50 now and it's going to take off after this weekend so get as much as you can.  Call me on my cell phone, okay.  I'm still in New York.  Um, my dad and I are going to be buying a bunch tomorrow and the only people I told is Sam and Ellen–its kind of a secret.  Okay, so give me a call or email me.  I love you.  Bye.

A TBC employee saved the message onto her computer under the file name

"rb_081104_PWRM.wav."

**H.      The FGWC Fraudulent Hoax Voicemail Campaign**

On or about August 9, 2004, one of Mills' stock promotion partners unsuccessfully

attempted to transfer 1,250,000 shares of FGWC stock to an account designated by Mills in order

to pay for a stock promotion campaign for FGWC.  On or about August 11, 2004, Anna Boling

called the onebox system from one of her home telephone lines and dropped a fraudulent hoax

voicemail message touting the stock of FGWC.  Thereafter, TBC distributed in substance the

following message recorded by A. Boling to answering machines and voicemail systems

throughout the United States:

Hey Patty, its Lisa, um, I can't find that number you gave me and I asked Jessica she said this was your new one so I hope it's the right one.  Anyway, remember Matt, that hot stock exchange guy I'm dating, remember when he gave my dad that stock tip in June on SMSI and it went from a buck to like to five bucks in two weeks.  You were mad cause I didn't call you about it, well, I'm calling you now cause there's this new company, its some wireless internet provider, whatever that is, and someone may be trying to buy it or sell it; it's kind of confusing.  But, anyway, its going up big this week–some big internet deal–and the stock symbol is F-G-W-C.  He said its open cheap, under 10 cents–sorry, I'm eating 'cause I'm starving–anyways, it's under 10 cents now, but it's going up to a buck or so, so get as much as you can.  Give me a call on my cell; I'm still in New York.

Um, my dad and me are going to be buying a bunch, and I only told Sam and Ellen about it, besides you now, because its kind of a secret.  Anyways, call me or e-mail me.  Love you, bye.

A TBC employee saved the message onto her computer under the file name

"rb_081104_FGWC.wav."

R. Boling contacted O'Grady and informed him that a voicemail campaign for FGWC would be done, and advised him to purchase FGWC stock.  O'Grady thereafter purchased FGWC stock on or about August 12, 2004.

**I.      The DNNI Fraudulent Hoax Voicemail Campaign**

On or about August 9, 2004, an unsuccessful attempt was made by one of Mills' stock promotion partners  to transfer 375,000 shares of DNNI stock to an account designated by Mills in order to pay for a stock promotion campaign for DNNI.  On or about August 11, 2004, Anna Boling called the onebox system from one of her home telephone lines, and dropped a fraudulent hoax voicemail message touting the stock of DNNI.  Thereafter, TBC distributed in substance the following message recorded by A. Boling to answering machines and voicemail systems throughout the United States:

Hey Jen, its Tara.  Um, I couldn't find that number you gave me and Sandy said this was your new one so I hope it's the right one.  Anyway, remember Chet that hot stock exchange guy I'm dating.  Remember when he gave my dad that stock tip in June on SMSI and it went from a buck to like five bucks in two weeks and you were mad because I didn't call you about it?  Well I'm calling you now because there's this new company that's supposed to be like the next Carrabba's and its going up big this week.  Some big food deal.  Anyways the stock symbol is DNNI and he said its opened cheap like 20 cents. . .I'm sorry I'm, I'm eating.  I'm starving right now.  Its 20 cents and its going up to a couple of bucks or something so get as much as you can.  Call me on my cell.  I'm still in New York.  Um, my dad and I are going to be buying a bunch tomorrow and I only told Sam and Ellen about it because its kind of a secret.  Anyways call me or email me.  Love you. Bye.

A TBC employee saved the message onto her computer under the file name "rb_081104_DNNI.wav."

As he had done previously, R. Boling contacted O'Grady and informed him that a voicemail campaign for DNNI would be done, and advised him to purchase DNNI stock.

**J.    The August 18, 2004 Fraudulent Hoax Voicemail Campaigns**

On or about the morning of August 18, 2004, A. Boling called the toll free number for the onebox system several times and recorded fraudulent hoax voicemail messages which touted certain stocks.  O'Grady instructed a TBC employee to stop running the voicemail telemarketing campaign for R. Boling.  Thereafter, O'Grady spoke to R. Boling, who informed O'Grady that additional messages for the stock voicemail campaign had been dropped.  R. Boling attempted to convince O'Grady to have TBC distribute these additional fraudulent hoax voicemail messages. O'Grady refused to distribute the additional messages.  Thereafter, R. Boling asked O'Grady to delete all messages from the campaign and all messages from Company A campaigns.

On or about August 18, 2004, O'Grady instructed a TBC employee to delete the messages relating to the R. Boling campaign off the TBC system.  The TBC employee attempted to delete the messages relating to the R. Boling stock promotion campaign from the TBC computer system.  Unbeknownst to R. Boling, O'Grady and others, at least one TBC employee maintained files and records relating to the fraudulent hoax voicemail campaign on a computer hard drive.

On or about August 18, 2004, R. Boling contacted O'Grady again to persuade O'Grady to have TBC distribute additional stock promotion messages.  R. Boling informed O'Grady that if the additional messages were not distributed, R. Boling would not get paid and TBC would not

get paid. O'Grady agreed to have TBC distribute additional messages for R. Boling. However, when O'Grady told a TBC employee to distribute additional voicemail messages for the stock promotion campaign, the TBC employee informed him that all pre-recorded messages and call data relating to the R. Boling campaign had been deleted. O'Grady contacted R. Boling and told him that the messages had been deleted. R. Boling responded that he would drop new messages onto the TBC system so that the campaigns could be run. Thereafter, A. Boling used a telephone at her home to drop additional fraudulent hoax voicemail messages touting the stock of AMUT, TWTN and PWRM onto the onebox system. On or about August 18, 2004, TBC distributed in substance the following messages recorded by A. Boling to answering machines and voicemail systems throughout the United States:

TWTN

Hey Jenna. Its Amy, I lost that number that you gave me but Tina told me that this was your new one so I hope I'm calling you at the right one. Anyways I'm calling because you remember Mike that hot stock exchange guy I date some times. He gave my dad that stock tip in March last year on TIWI, it was that internet phone International phone thing whatever it was. Anyway it went from like a buck to fifteen bucks and you were so mad because I didn't tell you about it. Well I'm calling you now. He just told me about this new company that signed some new deal and they are gonna be making some big announcement about it. Anyway the stock symbol is TWTN and he said its cheap now like 30 cents but its gonna be taking off this week so get as much as you can. Um, go ahead and give me a call on my cell phone if you can. I'm still in New York its (917) 715-4624. Um, my dad and I are gonna be buying a bunch and I already told Tina and Bob about it too, but I just wanted to let you know about it. Give me a call okay or email me. Bye.

AMUT

Hey Jen, its Tiffany. I couldn't find that number you gave me but Tina said that this was your new one so I hope I'm calling you at the right one. Anyways, remember Mike that hot stock exchange guy I date sometimes. Remember when he gave my dad that stock tip in March last year on TIWI it was that internet phone international phone thing whatever it was? Anyway it went from like a

14

buck to fifteen bucks and you were so mad at me because I didn't call you about it. Well, I'm calling you now cause he just told me about this other company and they're gonna be bought out next week or something and they're gonna be making a big announcement about it. Anyways the stock symbol is AMUT and he said its cheap now, like 10 cents but its gonna be taking off this week so go ahead and get as much as you can. Anyways call me on my cell. I'm still in New York, and its (917) 763-5696. Um, my dad and I are going to be buying a whole bunch of it and I already told Tina and Bob about it too. I just wanted to let you know. Give me a call okay. Miss you. Bye.

PWRM

Hey Sherry, its Laura. I can't find that number that you gave me but Tina said that this was your new one. So I hope I'm calling you at the right one. Um, do you remember Mike that hot stock exchange guy I date sometimes. Remember when he gave my dad that stock tip in March of last year on TIWI it was that internet phone international phone thing whatever it was? Anyway it went from like a buck to fifteen bucks and you were so mad cause I didn't call you about it. Well I'm calling you now because there's this other company that he just told me about and they've got some zillion dollar cancer detection thing and um they're going to be making some kind of big announcement about it. Anyways the stock symbol is PWRM and he said its cheap now like a couple of bucks but its gonna be going up this week. So, get as much as you can. Anyways give me a call on my cell. I'm still in New York. Its (917) 796-7779 and um my dad and I are going to be buying a bunch and I told Tina and Bob about it too. So I just wanted to let you know. So give me a call in a few. Bye.

A TBC employee saved the above messages on her computer under the file names: "01 - TWRM.wav, 02 - AMUT.wav, and 03 - TWTN.wav."

On or about August 19, 2004, R. Boling contacted O'Grady and insisted that O'Grady have TBC distribute additional messages. After O'Grady refused to have TBC distribute additional messages, R. Boling asked O'Grady to delete everything related to R. Boling off TBC's system. O'Grady instructed a TBC employee to delete everything off TBC's system relating to the R. Boling campaign, including the A. Boling messages, the RB campaign file, and call data information. Unbeknownst to R. Boling, O'Grady and others, at least one TBC employee maintained files and records relating to the fraudulent hoax voicemail campaign on a

15

computer hard drive.

On or about August 19, 2004, the United States Securities and Exchange Commission ("SEC") issued an investor alert and press release designed to warn American about a new stock manipulation scam sweeping the country: answering machine wrong number stock touts. The SEC investor alert described the voicemails being sent to investors disguised as misdirected voicemails. National and local news media on or around that date also described the voicemail messages, some of which was heard by persons involved in the stock promotion scheme. Some time later, O'Grady informed R. Boling that he had learned it would be easy to trace the voicemails. R. Boling responded with an expletive.

**K.      Mills and Boling Receive Bag of Cash as Payment for Fraudulent Voicemail Campaign**

In or about August 2004, R. Boling informed O'Grady that he was meeting the person, who would pay for the stock promotion campaign, in Gulfport, Mississippi. O'Grady, who has a pilot's license, offered to fly R. Boling to Gulfport, Mississippi to pick up payment for the fraudulent hoax voicemail campaign. On August 31, 2004, O'Grady flew in a private plane to Florida to pick up R. Boling. When O'Grady arrived in Florida to pick up R. Boling, he met R. Boling and Mills at the airport. R. Boling explained to O'Grady that the client they were meeting to receive payment, was really a client of Mills.

O'Grady, R. Boling and Mills flew in the plane to Destin, Florida and then onto Gulfport, Mississippi. Cellular telephone bills for Mills confirm that Mills was in Destin, Florida and Gulfport, Mississippi on August 31, 2004. Once they arrived in Gulfport, Mississippi, R. Boling, Mills and O'Grady went to a casino. Mills left R. Boling and O'Grady empty handed, and returned a short time later with a blue duffel bag which he handed to R. Boling. R. Boling

16

gave $10,000 cash from the bag to O'Grady, and gambled heavily at the casino while dipping

into the bag at various times to obtain additional cash with which to gamble.  Casino records

reflect that all three spent the night at the casino hotel, and that R. Boling purchased $22,450

worth of casino chips, tokens or other gaming instruments that night.  The next morning, R.

Boling paid O'Grady additional cash.  After paying O'Grady, R. Boling and Mills still had a

substantial amount of the cash they had received the day before.

### L.    Proof of Involvement in the Conspiracy and Stock Promotion Schemes

The factual summary above provides an ample description of the highlights of what the

Government will prove at trial concerning the defendants' integral role in the crimes charged in

the Indictment.

#### Jeffrey S. Mills

The United States will introduce substantial evidence of Mill's critical and extensive

involvement in the Conspiracy, and the Securities and Wire Fraud schemes charged in the

Indictment. This evidence will include testimony from multiple witnesses, and numerous

documentary exhibits including, but not limited to, brokerage firm and bank documents, cellular

telephone records, hotel records, documents obtained in the search of his residence, and

correspondence and other documents reflecting attempts to transfer stock to accounts designated

by Mills.  In addition, the evidence at trial will include the fraudulent voicemails and testimony

from victims who were defrauded.

The United States expects to prove that Mills was hired by several different partners to

promote five publicly traded securities:  MAUG, IVFH, PWRM, FGWC and DNNI.  The

evidence will demonstrate that Mills and his co-conspirators R. Boling and A. Boling chose to

17

use fraudulent hoax voicemails fraudulently to promote these securities and artificially inflate the price of these stocks.  The evidence will further establish that each conspirator was well aware of the fraudulent nature of the voicemails that were to be used to execute the schemes to defraud charged in the Indictment.  The manual for the AT&T Pre-Paid Wireless phone recovered during the search of Mills home which contains the number of the cellular telephone that was referenced in the MAUG fraudulent hoax voicemail provides evidence of Mill's link to creating the fraudulent hoax voicemails and in executing the mechanics of the scheme.

### Roderic L. Boling

The evidence that will be introduced at trial to prove R. Boling's significant involvement in the conspiracy and schemes charge in the Indictment will include the testimony of O'Grady, who had extensive dealings with R. Boling as R. Boling made arrangements on numerous occasions to have TBC distribute the fraudulent hoax voicemails.  In addition, the United States expects to use telephone records, numerous documents and records from TBC, testimony of TBC employees, testimony by other witnesses, casino documents and records, and records seized in the search of R. Boling's home to prove R. Boling's extensive involvement in the conspiracy and schemes charged in the Indictment.  The United States will introduce evidence that R. Boling profited from the scheme, and attempted to obstruct any investigation of the fraudulent stock promotion conspiracy and scheme.

### Anna Boling

The United States will introduce substantial evidence of A. Boling's critical, repeated and persistent involvement in the conspiracy and schemes charged in the Indictment.  The United States expects to introduce telephone subscriber records, telephone billing records, voice

exemplars, the fraudulent hoax voicemails, records and documents produced by TBC, other prerecorded messages she has done, and witness testimony to establish A. Boling's role and involvement in the conspiracy. The evidence will also include testimonial evidence related to A. Boling's extensive experience in telemarketing, and her role in doing other voicemails for R. Boling. The United States will also introduce financial records, including records which show A. Boling was dependent upon R. Boling's income.

## II.    ARGUMENT

### A.    Legal Standard

A trial judge has wide discretion in determining severance. United States v. Butler, 822 F.2d 1191, 1191 (D.C. Cir. 1987). One of the main factors the Court should consider in making a severance determination is to insure the judicial system's strong and legitimate interest in efficient and expeditious proceedings. United States v. Long, 905 F.2d 1572 (D.C. Cir.), cert. denied, 499 U.S. 948 (1990). Joinder of counts and defendants is designed to promote judicial economy and efficiency by avoiding multiple trials, and there is a strong preference for joint trials in the federal system where that can be accomplished without substantial prejudice to a specific trial right of the defendant. Zafiro v. United States, 506 U.S. 534 (1993). Salient factors the court should consider, and which militate against severance, include: (1) the presentation of the same evidence; (2) testimony from the same witnesses; and (3) the same illegal conduct. United States v. Manner, 887 F.2d 317 (D.C. Cir. 1989), cert. denied, 493 U.S. 1062 (1990); United States v. Tarantino, 846 F.2d 1384 (D.C. Cir.), cert. denied, 488 U.S. 840 (1988).

The decision to sever falls with the discretion of the trial court, and the balance is to be struck in favor of joint trials. Manner, 887 F.2d at 324. Rule 14 even countenances some

prejudice to a defendant from a joint trial because severance is not required simply because a

defendant might have a better chance of acquittal if tried separately.  See United States v.

Halliman, 923 F.2d 873, 884 (D.C. Cir. 1991), (citing Manner, 887 F.2d at 324); see also United

States v. Wright, 783 F.2d 1091, 1095 (D.C. Cir. 1986); United States v. Hopkins, 464 F.2d 816,

819 (D.C. Cir. 1972); United States v. Wilson, 434 F.2d 494, 501 (D.C. Cir. 1970).  The

defendant bears the "heavy burden" of proving prejudicial joinder under Rule 14 of the Federal

Rules of Criminal Procedure, and that "the threatened prejudice exists and can be remedied by

severance alone."   United States v. Simmons, 431 F. Supp.2d 38, 66 (D.D.C. 2006); see United

States v. Spitler, 800 F.2d 1267 (4th Cir. 1986). In making this determination, the Court must

balance the risk of prejudice to the defendant against the interest of judicial economy.  See

Butler, 822 F.2d at 1194. The risk of prejudice, however, must be compelling. United States v.

Cross, 928 F.2d 1030 (11th Cir. 1989), cert. denied, 502 U.S. 985 (1991).

        The test for determining "compelling prejudice" is the jury's ability to follow the trial

court's instructions and separate evidence relating to each defendant. Id. at 1039; see also United

States v. Leavitt, 878 F.2d 1329 (11th Cir.), cert. denied, 493 U.S. 968 (1989). In other words,

where adequate jury instructions are available, a defendant cannot make out compelling

prejudice. United States v. West, 877 F.2d 281 (4th Cir.), cert. denied, 493 U.S. 959 (1989).

        In conspiracy cases especially, severance should be the rare exception rather than the

rule. "Rarely, if ever, will it be improper for co-conspirators to be tried together." United States

v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995), cert. denied, 516 U.S. 1137 (1996) (citations

omitted). This is true even if all the conspirators are not charged in each, or all, the substantive

counts.  United States v. Leach, 613 F.2d 1295, 1303 (5th Cir. 1980). Nor is severance

appropriate simply because all the conspirators did not participate in all phases of the conspiracy, Blumenthal v. United States, 332 U.S. 539, 556-57 (1947); Leach, 613 F.2d at 1299, or because one defendant's role in the conspiracy was proven by "narrower and more limited" evidence than that against co-defendants.  United States v. Perholtz, 657 F. Supp. 603, 606 (D.D.C. 1986).

        1.    Disparity of the Evidence

Severance based on an alleged disparity of evidence between a defendant and a co-defendant is rarely granted pretrial for the fundamental reason that it is difficult to assess a claim of disparate evidence until the evidence is produced.  See, e.g., United States v. Haldeman, 559 F.2d 31, 72-73 (D.C. Cir. 1976), cert. denied, 431 U.S. 933 (1977).  A joint trial is inappropriate only when the party moving for severance shows that the evidence against one defendant is "far more damaging than the evidence against the other defendant."  Tarantino, 846 F.2d at 1398; accord Halliman, 923 F.2d at 884; Butler, 822 F.2d at 1194.  Absent dramatic disparity of evidence, any prejudice caused by joinder is cured by instructing the jury to consider separately the evidence implicating each defendant.[4] Long, 905 F.2d at 1581; Tarantino, 846 F.2d at 1398  ("jury instructions generally are sufficient to minimize any disparities in evidence"); Butler, 822 F.2d at 1194; United States v. Slade, 627 F.2d 293, 309 (D.C. Cir.), cert. denied, Johnson v. United States, 449 U.S. 1034 (1980); United States v. Cisneros, 26 F. Supp.2d 13, 22 (D.D.C. 1998) ("Any possible spillover can be cured with a sharply worded limiting

---

      [4] This is not a case where a given defendant claims that his ability to receive a fair trial is threatened where the defendant is being tried with individuals who have committed truly heinous or shocking crimes.  See, e.g., United States v. Sampol, 636 F.2d 621, 646 (D.C. Cir. 1980) (severance should have been granted where defendant was charged with misprison of a felony and making false statements while codefendants tried for conspiracy and murder, and where evidence at trial revealed "an intentional and extremely violent assassination scheme, gory details of which were described with extreme accuracy to the jury").

instruction."); United States v. Gray, 173 F. Supp.2d 1, 7 (D.D.C. 2001). ("Curative instructions are the preferred method of preventing prejudice to defendants; to assert severance over curative jury instructions, the defendant must show that jury instructions would be inadequate to cure any potential prejudice.").[5]

>            2.    Co-Defendant Testimony

In United States v. Ford, 870 F.2d 729 (D.C. Cir. 1989), the Court of Appeals set the standard to be used when a defendant seeks severance in order to have another co-defendant testify. The defendant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed. Once the movant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in

---

[5]  The Supreme Court in United States v. Lang, 474 U.S. 438 (1986) stressed the ability of curative instructions to address potential issues associated with evidence being offered against some but not all the defendants at trial: "When there are few defendants and the trial court is aware of the potential for prejudice, 'the risk of transference of guilt over the border of admissibility [may be] reduced to the minimum' by carefully crafted limiting instructions with a strict charge to consider the guilt or innocence of each defendant independently." Id. at 450 at fn. 13 (citation omitted). See also, United States v. Houle, 237 F.3d 71, 76 (1st Cir.), cert. denied, 532 U.S. 1074 (2001) ("[T]he district court took adequate measures to safeguard against the possibility of spillover prejudice by repeatedly instructing the jury to consider the evidence separately as to each defendant. In fact, the district court instructed the jury at the outset of the trial, several times throughout the trial, and during the final charge that it must consider the evidence against each defendant individually.); United States v. Faulkner, 17 F.32d 745, 759 (5th Cir.), cert. denied, 513 U.S. 870 (1994) ("Further, the court instructed the jury to 'consider each offense and the evidence pertaining to it separately as to each Defendant. The fact that you might find some or all of the Defendants guilty of one of the offenses charged should not control your verdict with respect to any other offense charged against him or any of the other Defendants.' Similar instructions have been held sufficient to cure any possibility of prejudice." (citations omitted)); United States v. Weiss, 491 F.2d 460, 467 (2d Cir. 1974) ("Mrs. Weiss was further protected against 'spillover' prejudice by the court's instructions to the jury, repeated on four occasions, that it must consider each charge against each defendant separately on the basis solely of the evidence introduced with respect to the defendant on that count.").

relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion. Id. at 317. The Court of Appeals further held that failure to provide a "reasonable probability" that the proffered testimony would be forthcoming regardless of the order of trials is sufficient to deny the motion. Id.

       3.    <u>Antagonistic Defenses</u>

A motion for severance can similarly be denied even in the instance where a defendant demonstrates antagonistic defenses in which one defendant may point the finger at a second defendant. As the Supreme Court held in <u>Zafiro</u>, mutually antagonistic defenses are not prejudicial *per se*. <u>Zafiro</u>, 506 U.S. at 539. The mere fact that two co-defendants intend to and do point the accusing finger at another during a joint trial does not require that their trials be severed. <u>United States v. Moore</u>, 104 F. 3d 377, 384 (D.C. Cir. 1997). "While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one." <u>United States v. Haldeman</u>, 559 F.2d 31, 71 (D.C. Cir. 1976). "The governing standard requires the moving defendant to show that the defendants present conflicting and irreconcilable defenses, and there is a danger the jury will unjustifiably infer that conflict alone demonstrates that both are guilty." <u>Id.</u>; <u>Tarantino</u>, 866 F.2d at 1399. "Application of this standard. . .requires that the accounts of co-defendants be not merely divergent from one another but indeed 'so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of this inconsistency." <u>Haldeman</u>, 559 F.2d at 71. "The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient ground to require separate trials." <u>Id.</u> Rule 14 does not require

severance even if prejudice is shown, rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion. <u>Zafiro</u>, 506 U.S. at 538-539. Much less drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice. <u>Id.</u>

**B.    Defendants' are Properly Joined, and Defendants' Motions to Sever, Which Fail to Articulate or Establish Undue Prejudice, Should be Denied**

As an initial matter, it is incontrovertible that these three defendants are properly joined in this Conspiracy, Securities Fraud, and Wire Fraud prosecution based on an Indictment which charges each defendant with exactly the same criminal offenses. A consideration of the charges in the Indictment and the preceding summary of some of the facts the United States expects to prove at trial amply demonstrates the incredible inefficiency of separate trials for these defendants because each trial would necessarily involve: (1) the presentation of the same evidence to prove the conspiracy and the execution of the schemes to defraud; (2) testimony of the same witnesses; and (3) proof of the same illegal conduct. As such, this multi-defendant prosecution represents a text book example of when defendants should be tried together in a conspiracy prosecution.

Notwithstanding the compelling reasons for a joint trial, all three defendants have moved for severance under Rule 14, but for different grounds. Defendant R. Boling has moved to sever because of (1) alleged disparate evidence against another defendant (Mills) and (2) the potential for conflicting or irreconcilable defenses between himself and Mills (though not A. Boling); A. Boling has moved to sever because of (1) alleged disparity of evidence between herself and R. Boling and Mills, (2) concern of being found guilty by association, (3) the potential for conflicting or mutually antagonistic defenses between herself and R. Boling, (4) denial of her

24

ability to call either R. Boling or Mills at a separate trial where she claims the co-defendants

"may offer exculpatory testimony for Ms. Boling," and (5) the admission of evidence in the case

that would not be admissible against her in a separate trial; and Mills has moved to sever (twice)

because of (1) alleged disparate evidence against the other defendants (A. Boling and R. Boling)

and concern over spillover prejudice, (2) concern over his ability to use the silence of one or

more co-defendants to his advantage, and (3) the potential for mutually antagonistic defenses

with R. Boling.  As discussed below, each of these motions is without merit.

### C.    Defendant R. Boling's Motion to Sever Should be Denied

R. Boling bases his Motion to Sever on the unsupported, conclusory argument that a joint

trial would cause unresolvable prejudice to him based upon the disparate evidence against Mills

versus himself, and that he has conflicting or irreconcilable defenses between himself and Mills.[6]

As an initial matter, R. Boling's motion provides little-to- no explanation as to how there is

evidence that only relates to Mills (and not him), and as to the defense he plans to advance that

would conflict with that of Mills.  As this Court has previously noted, defendants who rely only

on "vague assertions" and "conclusory arguments" to support their claims of severance cannot

establish undue prejudice.  United States v. Brodie, 326 F. Supp.2d 83, 94 (D.D.C. 2004)

(Huvelle, J.) (denying motion to sever).  The defendant must carry a "heavy burden" of proving

prejudice under Rule 14 to obtain severance, see Simmons, 431 F. Supp.2d at 66; one which

defendant R. Boling cannot meet by relying entirely upon vague assertions and conclusory

arguments.

---

[6] R. Boling has not claimed any prejudice with being tried together with defendant A. Boling: the government agrees that a joint trial with R. Boling and A. Boling would not constitute prejudice for either party.

Even if this Court were to examine R. Boling's vague assertions of prejudice, his claims are wholly without merit. As demonstrated above, this is not a case in which the evidence against R. Boling is disparate in relation to that of his co-defendant Mills. On the contrary, the United States will present substantial evidence of R. Boling's significant and persistent involvement in the conspiracy and schemes charged in the indictment. R. Boling was the point person in making arrangements for TBC to distribute the fraudulent hoax voicemails. He took particular care to instruct O'Grady to run the campaigns in such a way to conceal his and his co-conspirator's role in distributing the fraudulent hoax voicemails. He contacted O'Grady on numerous occasions to make sure the fraudulent hoax voicemails were distributed, and the fraudulent voicemails were dropped from his home telephone numbers. Moreover, R. Boling was aware of the fraudulent nature of the voicemails and the illegal purpose of the voicemails when he arranged for the fraudulent voicemails to be distributed. R. Boling profited from the distribution of the voicemails, and on at least two occasions took steps to conceal his crimes by asking O'Grady to have TBC records destroyed.

In the light of the government's expected evidence of his substantial involvement in the charged crimes, R. Boling's conclusory assertion that the evidence of his conduct is disparate to that of Mills' conduct is incorrect and unavailing. R. Boling essentially identifies the purported disparate nature of the evidence in one sentence which reads: "there is direct evidence that Mills profited from the alleged scheme and that he had knowledge of how the scheme was to work and how to take advantage of it." See R. Boling Motion to Sever at ¶ 7. As indicated above, the United States will introduce evidence that R. Boling also directly profited from the scheme when he participated in receiving the bag of cash at the Mississippi casino. In addition, R. Boling's

26

numerous discussions with O'Grady in which he encouraged O'Grady to purchase stocks promoted in the voicemails demonstrates that R. Boling understood how the scheme was to work, and how co-conspirators could profit from the scheme. The admission of evidence of Mills' stock sales at trial hardly makes the evidence against R. Boling disparate to that of Mills. See Long, 905 F.2d at1581 (requiring "gross disparity" of disparate evidence before severance).

R. Boling's second argument in favor of severance, which is premised upon a vague assertion of conflicting and irreconcilable defenses with Mills, is also specious. R. Boling claims that because the government will present evidence as to Mills' stock purchases and the benefit Mills received from the conspiracy, R. Boling will at trial, "necessarily have to disassociate from the trial of the co-defendants." See, R. Boling Motion at ¶19 (misnumbered). R. Boling has in no way articulated a mutually antagonistic defense, nor is there any apparent conflict in the defenses of Mills and Boling, as it is completely consistent for both R. Boling and Mills to dispute the government's evidence as to Mills' knowledge and stock purchases. The mere fact R. Boling does not like certain evidence related to his co-defendant (and himself) does not make his defense (still undisclosed) antagonistic to Mills such that a severance is required. See Brodie, 326 F.Supp.2d at 94 (recognizing that severance not warranted simply because there may be "some hostility among the defendants, or that the co-defendants' strategies are generally antagonistic"). Instead, the evidence as to Mills involvement in the conspiracy is directly relevant to the Government's case against R. Boling, and R. Boling has presented no argument sufficient to overcome the strong preference for a joint trial of all the conspirators.

**D.**     **Defendant A. Boling's Motion to Sever Should be Denied**

As noted above, A. Boling makes five claims in support of her Motion to Sever, three of which are the same issue: (1) disparate evidence against her other defendants; (2) concern that A. Boling will be found guilty by association (this is the same as the disparate evidence issue); (3) concern that evidence will be admitted in the trial that would be inadmissible against her in a separate trial (this is a disparate evidence concern); (4) antagonistic defenses with R. Boling; and (5) inability to call an exculpatory co-defendant (Mills and/or R. Boling). As with R. Boling's motion, A. Boling provides scant explanation, discussion or analysis as to how she would be unduly prejudiced by a joint trial, and her motion should be denied for failing to meet her burden to demonstrate sufficient prejudice. See Brodie, 326 F. Supp.2d at 94 (defendant cannot rely on "vague assertions" and "conclusory arguments"). Even if A. Boling's motion is sufficiently detailed, severance is not warranted.

1.     The Evidence Against A. Boling is Not Disparate, and There is No Risk of Guilt by Association or Undue Prejudice Due to Evidence of the conduct of Co-defendants R. Boling and Mills.

As discussed above, if there is a "gross disparity" of evidence against one defendant versus another, a court *may* sever the defendants under certain limited circumstances. Long, 905 F.2d at 1581. Severance may be warranted in those rare cases in which there is such a disparity of evidence that there is a concern that a jury could convict the lesser defendant by association because the jury would not be able to follow the court's jury instructions and "compartmentalize the evidence introduced against each individual defendant." See, United States v. Mejia, 448 F.3d 436, 446 (D.C. Cir. 2006), cert. denied, 127 S. Ct. 989 (2007) (quoting United States v. Halliman, 923 F.2d 873, 884 (D.C. Cir. 1991)). Three of A. Boling's claims for severance are

premised upon grounds of "disparity of the evidence" arguments.   As part of the disparate

evidence analyses, courts examine the prejudicial effect of evidence to be presented at trial as it

relates to each defendant to examine if there is any undue prejudice of being found guilty by

association or because of the nature of the evidence offered at the trial.

The United States' evidence as to A. Boling's involvement and role in the conspiracy is

not disparate as compared to her co-defendants.   As an initial matter, all of the defendants were

indicted on the exact same criminal charges (no more, no less).   As summarized above, the

evidence at trial will demonstrate that A. Boling's activity in furthering the conspiracy and

schemes charged in the Indictment was repeated, persistent and vital to its success.   A. Boling

was also an experienced telemarketer who recorded each of the fraudulent hoax voicemails that

were utilized to fraudulently induce investors to purchase stock and to artificially inflate and

manipulate the price of the securities of:  MAUG, IVFH, PWRM, FGWC and DNNI.  During the

period of late July through August 18, 2004, A. Boling on at least eight separate occasions

recorded fraudulent hoax voicemails from a phone in her home.  In each of these messages A.

Boling used different aliases, and included unique stock specific information.  Hers was the

voice that made the fraud work.  If A. Boling's recordings were not done in a manner that

convinced prospective investors that it was a real message, the fraud surely would have failed.

Moreover, at least with regard to two of the fraudulent hoax messages A. Boling set up outgoing

voicemail messages for cell phone numbers referenced in the messages to make it appear that the

message was from a real person named "Debbie" or "Renee." Prospective investors who called

these cell phone numbers, would hear A. Boling's voice attached to the name of the person who

left the fraudulent hoax voicemail, and be left with the false impression that the voicemail

received was legitimate.  A. Boling's role in the fraud was vital and persistent.  In addition, A. Boling profited from the scheme, because she relied upon R. Boling for financial support and he received cash from Mills for executing the scheme.  Thus, the evidence against A. Boling is far from minimal, and is certainly not disparate.

Even if A. Boling could point to some disparity in evidence against her, however, the mere existence of disparate evidence against R. Boling and Mills versus A. Boling is insufficient to show undue prejudice.  See Mejia, 448 F.3d at 446 (severance inappropriate even where the "bulk of trial evidence concerned" the co-defendant); Gray, 173 F. Supp. 2d at 10 ("showing that there is more evidence against one defendant, that there are more charges against one defendant, or that the evidence is stronger against one defendant than against others is insufficient to prevail on a demand for severance"); Perholtz, 657 F. Supp. at 606 (no prejudice even where evidence against defendant was "narrower and more limited" than other defendants).  Severance is particularly not appropriate in this case where defendant A. Boling has not, and cannot show that there is any danger a jury would find her guilty by association because of an inability to follow the court's instructions and compartmentalize the evidence introduced against each individual defendant.

Indeed, A. Boling has not identified any government evidence that would not be admissible against her if she did have a separate trial.  The government has alleged a single conspiracy in the indictment, and all evidence relevant to the conduct of the entire conspiracy – including co-conspirator statements and the actions of other co-conspirators in furtherance of the conspiracy – is relevant evidence at the trial of all of the co-conspirators, regardless of whether

severance is granted.[7]  See, e.g., FRE 801(d)(2)(E) (co-conspirator statements are not hearsay);

Leach, 613 F.2d at 1299.  Thus, contrary to A. Boling's suggestion, evidence as to R. Boling and

Mills' receipt of cash payments for their roles in the conspiracy is admissible in a trial against

her even if severance was granted.[8]  Importantly, this is not a case involving multiple

conspiracies or criminal activity which occurred over several years: almost all of the

government's evidence would be relevant to separate trials of each of the co-conspirators.  Given

the substantial benefits of judicial economy, there is no basis to suggest that severance should be

granted because of a risk of prejudice from hereto unidentified evidence that may be offered

against other co-conspirators.[9]

_____

[7] Any claim by A. Boling that she should be severed because she did not spend as much time on the conspiracy as her co-defendants is irrelevant for severance purposes.  See United States v. Gray, 173 F. Supp.2d 1, 12 (D.D.C. 2001) ("the amount of time that a defendant was involved in an alleged conspiracy has never been recognized as a valid basis for severance").  Similarly, A. Boling's awareness of her co-conspirators' actions in furtherance of the conspiracy is not a relevant consideration in determining whether severance is required.  See United States v. Leach, 613 F.2d 1295, 1299 (5th Cir. 1980) (joinder appropriate where participants claimed to have no knowledge of all aspects of the conspiracy).

[8] The evidence that A. Boling references in her motion as being potentially prejudicial relates to cash receipts by her co-conspirators (including R. Boling).  However, this evidence is not prejudicial in the severance context.  This evidence is directly relevant to A. Boling's profit in this case (which the government contends is a benefit that R. Boling, her husband, "agent," and sole supporter, received for their combined work in the conspiracy), and is admissible against her as evidence of the overall conspiracy and acts done by her co-conspirators in furtherance of the conspiracy.  It is therefore not "disparate" evidence.

[9]A. Boling's suggestion that Rule 404(b) other acts evidence is an issue requiring a disparate evidence severance is without merit.  A. Boling's role in the conspiracy is very straightforward and unlikely to be intermingled by a jury with the Rule 404(b) actions of, or evidence against her other co-defendants, who are not alleged to have recorded any of the voicemail messages.  This is particularly true here where the United States has not sought to introduce extensive Rule 404(b) evidence, and where the defendant can not show that a large amount of evidence would not be admissible in a separate trial of her alone.  Because A. Boling's role in the conspiracy is easily understandable, and a jury will easily be able to compartmentalize the evidence against her, she will not suffer any unfair prejudice as a result of

Finally, any perceived risk of disparate evidence can easily be dealt with through the use of limiting instructions on the evidence, which jurors are presumed to follow. This is not a case so complex that a Jury will have difficulty in understanding and following the court's instructions, nor is it a violent case involving gruesome/prejudicial facts relating to one defendant only. In the case at bar, where a grand jury indicted all three defendants for their involvement in a joint conspiracy and scheme to defraud, there is no reason why a well-crafted limiting instruction could not remove any remote potential of prejudice against A. Boling. See, e.g., Tarantino, 846 F.2d at 1398; Gray, 173 F.Supp.2d at 7 ("defendant must show that jury instructions would be inadequate to cure any potential prejudice").

2.    A. Boling Does Not Have An Antagonistic or Conflicting Defense

A. Boling states that the potential antagonistic defense between she and her ex-husband would be that because they both "were the sole adult occupants of a residence that was allegedly the source of the dropped 'fraudulent' phone messages . . . [sic] [they] may rely upon the defense that the other is responsible." A. Boling Motion to Sever at 5. This argument, however, ignores the fact that the voice on the voicemails is clearly a female voice, and the government will only be presenting evidence that the voice was that of A. Boling. There is no reasonable likelihood, or even argument, that R. Boling recorded the voicemails.

Even if A. Boling had suggested (without basis) that R. Boling's sole defense will be that A. Boling is guilty – and that he is innocent – she has not shown how this defense conflicts with

a joint trial.

her own defense and that such a conflict would cause undue prejudice to result.[10]  Clearly, speculative claims of conflicting defenses are not sufficient for severance.  See Brodie, 326 F. Supp.2d at 83 (severance denied where defendants could not show how defenses were conflicting and irreconcilable).  More importantly, the "mere fact that a [defendant] and his co-defendant intended to and did point the accusing finger at one another during the joint trial does not require that their trials be severed." Moore, 104 F.3d at 384.  A. Boling bears the burden to prove that the prejudice is so severe that there is a "serious risk" of compromising a defendant's trial rights or overwhelming the jury, id., a burden she simply has not, and cannot meet.

### 3.    No Exculpatory Witnesses nor Claim of Testimony

As with her other arguments, A. Boling's claim that her co-defendants R. Boling and/or Mills have exculpatory testimony as to her is completely speculative.  A. Boling does not identify what testimony they would provide, nor how it would be clearly exculpatory as to her role in the conspiracy.  As noted above, speculation cannot form the basis for severance, see Brodie, 326 F. Supp.2d at 83, and the D.C. Circuit has been clear that in order to obtain severance on this basis, the defendant must make a *primae facie* showing of a reasonable probability that (1) one of her co-defendants would provide necessary exculpatory testimony, (2) would waive his Fifth Amendment rights,[11] and (3) would testify at a severed trial regardless of

---

[10]  Significantly, R. Boling has not sought severance based upon any conflicting defense he may have with A. Boling.

[11]  A. Boling states in her motion that if an "affidavit" is filed then she is entitled to severance under United States v. Vigil, 561 F.2d 1316 (9th Cir. 1977).  Vigil says nothing of the kind.  The Vigil court simply noted that the trial court examined an affidavit filed by the defendant's attorney to establish what the co-defendant's testimony would have been and whether the co-defendant would have testified in a severed trial.  Id. at 1317.  The affidavit is irrelevant to defendant's burden to show that her co-defendant actually has exculpatory

33

the order in which the trials occur.  See Ford, 870 F.2d at 731-732.  Since A. Boling has not even

attempted, and indeed, could not make out the *prima facie* showing required, severance on these

grounds must be denied.

    **E.**    <u>Mills' Motion to Sever Is Should Also be Rejected</u>

    Mills, like his co-defendants, requests severance (in two motions) for essentially three

reasons: (1) concern over prejudice from claimed disparate evidence against co-defendant R.

Boling and prejudicial "spillover" from such evidence; (2); possibly prejudice if one but not all

of the co-defendants might testify and the Court allows defense counsel to comment on the

silence of one of the non-testifying defendants; and (3) the existence of antagonistic defenses.

As with the other co-defendants, Mills' motion is based upon vague and conclusory arguments,

and should be summarily rejected.  See Brodie, 326 F. Supp.2d at 94.  In addition, each of the

grounds for Mills' severance motion lacks merit.

    1.    <u>Evidence Against Mills is Not Disparate or Unduly Prejudicial</u>

    As described above, the evidence of Mills involvement in the conspiracy and schemes to

defraud charged in the Indictment is neither disparate nor sparse.  Rather, the United States

expects to introduce substantial documentary and testimonial evidence of Mills' critical and

extensive conduct in committing the offenses charged in the Indictment.  The only evidence that

Mills has identified as being disparate and prejudicial to him is evidence of R. Boling's

involvement with TBC to distribute the voicemails, and R. Boling's previous criminal

---

testimony.  The other case cited by A. Boling, <u>United States v. Echeles</u>, 352 F.2d 892 (7th Cir.
1965) says nothing of an affidavit requirement, and again requires the defendant to prove the
exculpatory nature of the co-defendant's testimony.

convictions.[12]  These issues will be addressed separately.

Evidence of R. Boling's involvement with TBC to arrange distribution of the voicemails does not make the evidence against Mills disparate, nor is the evidence concerning R. Boling's involvement with TBC and O'Grady unduly prejudicial.  This is because the government's evidence will show that Mills, R. Boling and A. Boling  worked together to fraudulently promote the stocks via the fraudulent hoax voicemail campaign–each performing different roles to execute the conspiracy and schemes to defraud charged in the Indictment.  Far from being disparate evidence, this evidence is directly related to Mills and proof of the conspiracy.  Moreover, even if defendants were each granted separate trials, the United States would by necessity have to introduce evidence concerning R. Boling's involvement with TBC at each trial to prove the conspiracy and the execution of the schemes and conspiracy charged in the Indictment.

With regard to evidence of R. Boling's criminal convictions,  the government does not intend to introduce evidence of R. Boling's convictions in its case in chief.[13]  See Government

_____

[12]  Mills has suggested that because this is a complex case, severance is favored under Zafiro v. United States, 506 U.S. 534 (1993) (citing Kotteakas v. United States, 328 U.S. 750, 774-75 (1946) for the proposition) .  Mills, however, overstates the point in Zafiro.  The Court in Zafiro cited Kotteakas as an example of a complex case with co-defendants of markedly different degrees of culpability where severance might be appropriate: Kotteakas involved an indictment alleging a 36 person conspiracy, that involved eight different sub-conspiracies and a great disparity of evidence between the defendants.  Here, the government has alleged a single basic conspiracy in which all the participants were involved.  Although this may be a long trial, it is not an overly complicated scheme with significant potential for juror confusion.

[13]  The case cited by Mills, United States v. Fisher, 106 F.3d 622 (5th Cir. 1997), abrogated on other grounds by Ohler v. United States, 529 U.S. 753 (2000), is inapposite.  There, the court stated severance was required where the trial court erroneously allowed a co-defendant's conviction into evidence, but in opening statement the other defendant had stated his theory of the case was bound together with the co-defendant.  Id. at 632.  Here we do not have erroneously

Motion to Introduce Previous Convictions filed 2/23/07.  To the extent that R. Boling testifies, the United States intends to introduce evidence of his criminal convictions to impeach R. Boling's credibility.  Introduction of evidence of R. Boling's criminal convictions into evidence for this limited purpose poses no risk of spillover prejudice to Mills as the Court can and should fashion a proper limiting instruction for the Jury.  This is precisely the type of limiting instruction that Jurors consistently demonstrate an ability to follow.  Thus, any concern of prejudicial or disparate evidence is erroneous, and Mills cannot meet the his burden of proving a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  Zafiro, 506 U.S. at 538.

> 2.    There is No Basis for Severance Based on Speculative Arguments as To Potential Defendant Testimony And Any Attempt by Attorney to Comment on Co-Defendant's Silence is Unduly Prejudicial and Inadmissable.

Mills second argument for severance is that because one but not all of the defendants may testify, severance is required under De Luna v. United States, 308 F.2d 140 (5th Cir. 1962) (requiring severance where co-defendant may be able to comment on defendant's silence at trial).  Mills overstates the De Luna doctrine, particularly as decided by the D.C. Circuit, and no severance is required in this case.

The concept of De Luna is straight forward:  in a multi-co-defendant case there is very

---

admitted evidence, and should R. Boling testify a proper limiting instruction will limit any potential prejudice.  See id. at 632 n.2 (limiting holding to "extraordinary circumstances" of this case and noting "[o]ur conclusion that Fisher was entitled to a separate trial, under the unique circumstances of this case, does not signal a retreat from the general principle that the mere "spillover" effect of damaging evidence introduced against one defendant is insufficient to warrant the severance of other defendants")

narrow circumstances under which a testifying co-defendant's attorney may permissibly

comment on the silence of a non-testifying co-defendant in the same trial. See, e.g., United

States v. Lemonakis, 485 F.2d 941, 952 (D.C. Cir. 1973) (discussing De Luna). As such, if a De

Luna argument is available to a defendant, severance may be required to avoid undue prejudice.

Id. As decided by the D.C. Circuit, however, a De Luna argument is only admissible and

available to a defendant if a defendant has testified, his co-defendant has not testified, and the

defendant's attorney has "a duty to comment [on the silence], which in turn exists only when the

defenses raised are truly antagonistic." Id. at 952; accord United States v. Ehrlichman, 546 F.2d

910, (D.C. Cir. 1976), cert. denied, 429 U.S. 1120 (1977). As such, severance will only be

required in the "the presence of mutually exclusive and irreconcilable defenses." Ehrlichman,

546 F.2d at 930. In this regard, Ehrlichman is instructive, as the Court denied a requested "De

Luna" severance even where Ehrlichman was the only defendant out of seven co-conspirators

who chose not to testify at trial. Id. As this Court is aware, none of the defendants in this case

has announced whether they will be testifying at trial or unmistakably identified their defenses at

trial. As such, Mills' request for a "De Luna severance," is premature, and as discussed below,

unavailable because Mills has no inconsistent or irreconcilable defense with any of his co-

defendants.[14]

      To the extent that it later appears Mills (and possibly other defendants) anticipate

utilizing a De Luna argument during trial (i.e. that one defendant can argue to the jury that it can

infer the guilt of one of the co-defendants by his/her silence), the United States will move *in*

---

[14]To the extent that the United States intends to introduce any out of court statements
made by co-defendants which implicate other co-defendants, these statements can easily be
redacted to avoid a Bruton problem.

*limine* to bar such an argument under Fed.R.Evid. 403.  Any perceived slight probative value of such an argument would be greatly outweighed by a danger of unfair prejudice to the other co-defendants, and the severe risk of confusing the Jury.  Indeed, the United States now requests this Court to bar any such argument by any party to the Jury without prior consultation with, and approval of, the Court.  Therefore, a De Luna severance is not warranted in the case at bar.

> 3.    Mills Has No Irreconcilable or Mutually Antagonistic Defense with Any of His Co-Conspirators.

Mills' motion for severance based upon mutually antagonistic defenses must be rejected because he has failed to carry his heavy burden to show that (1) the defendants will present conflicting and irreconcilable defenses, (2) there is a danger the jury will unjustifiably infer that this conflict alone demonstrates both are guilty and (3) that any risk of undue prejudice cannot be cured with a proper limiting instruction.  See, Zafiro, 506 U.S. at 538-539; Tarantino, 866 F.2d 1399; Haldeman, 559 F.2d at 71.  As an initial matter, Mills has utterly failed to explain or demonstrate how or why his defenses are contrary or inconsistent with the potential defenses of his co-conspirators.  In his most recent motion, Mills' only claim of inconsistent defenses is that "his defense of 'I did not do it' is completely antagonistic, irreconcilable and mutually exclusive with Mr. Boling's defense of 'I had no intent to defraud.'  Mills Second Motion to Sever at 5.  In his first motion, however, Mills claimed his defense was that "[b]ecause Mr. Mills was not responsible for hiring [TBC] and then creating and directing the content and the manner in which the hoax voice messages were delivered and distributed, he does not have to defend against those allegations," thus suggesting his defense will also be that he did not have the intent to defraud

because he didn't know what R. Boling was doing.[15]  Mills First Motion to Sever at 3.

Regardless of which of the articulated defenses Mills decides to pursue, Mills has not even remotely demonstrated that his defense will be antagonistic or in conflict with that of R. Boling.  On its face, there is also no apparent conflict or inconsistency between a defense by Mills that he didn't do it (i.e., I have nothing to do with it) or didn't have an intent to defraud, and a defense by R. Boling that he also did not have any intent to defraud.  Moreover, any perceived conflict certainly does not rise to the level of presenting any risk that the jury could infer guilt solely upon the basis of the conflict in defenses.

Since neither Mills nor R. Boling have met their burden of demonstrating how any of their potential (realistic) defenses are mutually antagonistic requiring severance, see Simmons, 431 F. Supp.2d at 66, and there is no legitimate claim that there is a "serious risk" that a joint trial will compromise any defendants' trial rights or confuse the jury, Moore, 104 F.3d at 384.  Defendants are not entitled to severance merely because it may improve their chases for an acquittal in a separate trial.  See, e.g., Zafiro, 506 U.S. at 540.  Accordingly, Mills' motion to sever based upon so called antagonistic defenses should be denied.

---

[15] The United States intends to submit evidence that Mills did indeed know the fraudulent nature of the fraudulent hoax voicemails used to promote the stocks set forth in the Indictment.

**III.    CONCLUSION**

For the foregoing reasons, the United States respectfully requests that each defendant's motion to sever be DENIED.

Respectfully submitted,
JEFFREY A. TAYLOR
UNITED STATES ATTORNEY
D.C. Bar No. 498610


By:    _____/s/_____
JONATHAN R. BARR
D.C. Bar No. 437334
TEJPAL CHAWLA
D.C. BAR NO. 464012
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W., Room 5245 and 5840
Washington, D.C. 20530
(202) 353-2442

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that a copy of the foregoing Omnibus Response to Defendants' Motions to Sever was served via ECF to defense counsel for the following defendants on this 26th day of March, 2007:


For Anna Boling
Joanne Hepworth, Esq.

For Roderic Boling
Thomas A. Abbenate, Esq.

For Jeffrey A. Mills
Robert O. Switzer, Esq.
Soloman L. Wisenberg, Esq.


_____/s/_____
TEJPAL S. CHAWLA
Assistant United States Attorney

41