UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 06-228 (ESH) |
| | : | |
| v. | : | |
| | : | |
| JEFFREY S. MILLS | : | |
| RODERIC L. BOLING; AND | : | |
| ANNA BOLING, | : | |
| | : | |
| Defendants. | : | |

**GOVERNMENT'S MOTION *IN LIMINE* TO PRESENT EVIDENCE OF
THE FINANCIAL STATUS OF DEFENDANTS' ANNA AND RODERIC BOLING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully moves this Court for an Order *in limine* to permit the government to introduce at trial certain evidence concerning the financial status of defendants' Anna and Roderic Boling which is highly probative of the defendants' motive and intent to commit the crimes alleged in the indictment. The government believes that almost all of the financial status evidence it seeks to admit is not classic "evidence of other crimes, [or] wrongs" under FRE 404(b), but to avoid any disagreement on this issue, the government outlines its proposed proof of the Bolings' financial status to allow the defendants' an opportunity to object to this evidence. As further discussed herein, information related to the Bolings' financial status is relevant and admissible to show the defendants' motive and intent in committing the acts alleged in the indictment.

**I.   EVIDENCE OF BOLING'S FINANCIAL STATUS**

As discussed in the Indictment, the Bolings are alleged to have engaged in the criminal and fraudulent promotion of a number of thinly traded stocks in our about July, 2004 through late August 2004. This time period was crucial to the Bolings, as it was at about this same time that

they experienced unusual and significant cash flow problems.  As discussed below, it is the government's contention that these looming financial and family problems motivated the Bolings desire to engage in this fraudulent criminal conspiracy.

      Throughout 2003 and 2004, Anna and Roderic Boling were married, lived together with two young children, and jointly relied on Roderic Boling as the sole breadwinner in the family.  At the beginning of 2004 the Bolings lived in a large mortgaged home valued at more than $900,000 and utilized at least three leased vehicles: a 2004 Cadillac Escalade, a 2004 Chrysler Pacifica and a 2004 BMW.  They were relatively up to date on all their bills and enjoyed excellent credit.  In mid-2004 Anna Boling gave birth to her second child with Roderic Boling, and did not work outside the home.  In late 2003, early 2004, Roderic Boling made a significant income from the operation of, Direct Activation, which utilized telemarketing to sell satellite TV subscriptions for Direct TV, and Water Equipment Technology Inc.  Roderic Boling was a part owner of Direct Activation, and Direct Activation was paid by Direct TV for each subscription it sold, and it operated a telemarketing call center to assist in selling these subscriptions.  To facilitate Direct Activation's operation (and Water Equipment Technology), Roderic Boling entered into an agreement with Telephone Broadcast Company (TBC), a firm that utilized automatic dialing equipment and phone lines to distribute its clients' pre-recorded audio messages to telephones throughout the United States.  As part of his agreement with TBC, Roderic Boling leased a significant block of telephone capacity from TBC which cost approximately $9,000 a month.  Direct Activation utilized TBC to make its telemarketing phone calls and regularly had TBC distribute pre-recorded phone solicitations that were recorded by Anna Boling.  The agreement between TBC and Roderic Boling also called for Roderic Boling to pay TBC for the

thousands of phone calls it made on his behalf.

By mid-2004, Direct Activation and Roderic Boling were beginning to experience financial difficulties. In May, 2004, the Bolings took out a second mortgage on their home. In or about the summer of 2004, Direct Activation's call volume decreased substantially, and Direct TV indicated it was unhappy with some of Direct Activation's marketing practices. On July 30, 2004, Direct TV officially cancelled its contract with Direct Activation because of what it believed were breaches to its marketing contract, and thus deprived Direct Activation and the Bolings of much needed income. Direct Activation was also behind in its bills to its creditors. By the end of July, 2004, Direct Activation owed TBC tens of thousands of dollars, and owed significant debts to a number of other creditors.

Near in time to when the Bolings' (and Mills') fraud occurred, a number of creditors initiated law suits against Direct Activation, Roderic Boling, and Anna Boling (among others) for hundreds of thousands of dollars for failing to uphold their business commitments. These creditors eventually obtained default judgements against Direct Activation, Roderic Boling, and others for hundreds of thousands of dollars. The Bolings personal and business credit card accounts reflect a significant rise in balances throughout the summer of 2004, and by early 2005 almost all of their personal and business credit cards were either maxed out or in default. Roderic and Anna Boling divorced in July 2005, and Roderic Boling declared bankruptcy on October 16, 2005. In his bankruptcy filings, Roderic Boling represented that he owed creditors over $1.7 million, including over $175,000 in credit card debt and $165,362 in back taxes. Anna Boling similarly declared personal bankruptcy on October 27, 2005, and indicated that she owed creditors over $1.211 million, including over $125,000 in credit card debt and $88,755 in back

taxes.

In sum, the government seeks to introduce evidence that in 2003 the Bolings were living very well and in good financial health, but that by the summer of 2004 they began to suffer significant financial distress. The government seeks leave to introduce evidence from the period 2003 through 2005 as to the Bolings quality of life, their spending patterns, income, debts (including increasing credit card debt), law suits, default judgments, bankruptcy filings, tax filings, and overall financial status. As discussed below, this evidence is directly relevant to the Bolings' motive and intent, and is admissible in the government's case in chief.

## II.    SUCH EVIDENCE IS RELEVANT, PROBATIVE, AND ADMISSIBLE

As stated at the prior status hearing, it is the government's contention that none of the above evidence is "other crimes" evidence which indicates that the Bolings engaged in illegal or criminal activity. As such, the test at issue is merely whether evidence of the Bolings' financial condition is relevant under FRE 401 and not unduly prejudicial under FRE 403. See United States v. Mitchell, 172 F.3d 1104 (9th Cir. 1999) (financial status of defendant is not other crimes evidence under FRE 404(b)); United States v. Hawkins, 360 F.Supp.2d 689 (E.D. Pa. 2005) (same).[1] Even if FRE 404(b) were applicable here, the evidence of the Bolings' financial status is admissible and is directly relevant to the defendants' motive and intent in committing the fraud at issue in this case.

---

[1] Some courts have analyzed financial condition under the FRE 404(b) rubric where the alleged activity was perceived to be illegal in nature, see, e.g., United States v. Gray, 292 F.Supp.2d 71, 92 (D.D.C. 2003) (money laundering and financial status analyzed under FRE 404(b)). Even if FRE 404(b) applied, the evidence of the Bolings' financial status is directly relevant to the defendants' motive and intent in committing the fraud at issue in this case, and would nonetheless be admissible under FRE 404(b).

4

The law is relatively clear that evidence of a defendant's poverty or wealth, standing alone, is generally irrelevant in most criminal cases. However, it is well established that in fraud cases evidence of a defendant's financial need or change in circumstances at the time of the alleged criminal conduct can be highly relevant evidence of a defendant's motive and intent to engage in the fraud. See, e.g., United States v. Weller, 238 F.3d 1215, 1221 (10th Cir. 2001) (financial status is relevant in fraud case where defendant has a "sudden change in financial status"); Mitchell, 172 F.3d at 1109 (recognizing financial circumstances admissible where defendant suffers "abrupt change in circumstances"); United States v. Jackson, 882 F.2d 1444, 1449 (9th Cir. 1989) (holding financial circumstances were admissible where defendant was having financial difficulty, short of funds, and had borrowed money); United States v. Zipkin, 729 F.2d 384, 390 (6th Cir. 1984) (recognizing that "in cases of merely peculative crime (such as larceny or embezzlement)" the fact that the defendant did not have money but "was in need of it at the time is decidedly relevant" (quoting II Wigmore on Evidence § 392 (1979)); Hawkins, 360 F.Supp.2d at 695 (in fraud cases recognizing that financial circumstances are admissible where there is "evidence that a defendant is facing financial pressure"); see also United States v. Davis, 409 F.2d 453, 456 (D.C. 1969) (recognizing that evidence solely showing that a defendant was poor in a robbery trial would be inadmissible, but that such evidence may be admissible in other cases, particularly if the defendant had "financial difficulties").

Applied to the case at bar, Anna and Roderic Bolings' financial circumstances are highly relevant to the fraud alleged in the Indictment. The Bolings' suffered a dramatic and significant change in their financial fortunes starting in the summer of 2004, and they recognized the onset of significant personal and business debts coming their way. It was at the same time that the Bolings

committed the fraud alleged in the Indictment. It is the government's contention that Anna and Roderic Boling, facing serious and significant financial straights, perpetrated this fraud to help pay off their mounting debts, and support their rich lifestyle. The Bolings' financial circumstance thus demonstrates a clear motive and intent to engage in the fraud. As the evidence shows, the extent of their perceived risk to their financial security was quite real, and despite their efforts to stave off bankruptcy through the fraud, they were ultimately unable to do so. Given the highly probative nature of this motive and intent evidence, and the ability of the Court to craft a proper limiting instruction, the government should be permitted to present evidence of the Bolings' financial circumstances.

## CONCLUSION

The government hereby respectfully requests that it be permitted to introduce at trial evidence concerning the financial status of defendants' Anna and Roderic Boling which is highly probative of the defendants' motive and intent to commit the crimes alleged in the Indictment.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia

By:  _____/s/_____
TEJPAL S. CHAWLA
D.C. Bar No. 464012
Jonathan R. Barr
D.C. Bar No. 437334
Assistant U.S. Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 353-2442 (Chawla)

(202) 514-9620 (Barr)

CERTIFICATE OF SERVICE

I hereby CERTIFY that a copy of the foregoing Government's Motion in *Limine* to Present Evidence of the Financial Status of Defendants' Anna and Roderic Boling has been sent by ECF filing to counsel for the defendants:

Robert O. Switzer, Esq. (defendant Jeffrey Mills)

Thomas Abbenante, Esq. (defendant Roderic Boling)

Leslie McAdoo, Esq.. (defendant Anna Boling)

this 4th day of May, 2007.

_____/s/_____
Tejpal S. Chawla
ASSISTANT UNITED STATES ATTORNEY